EDWARD W. REID AND MARJORIE S. REID, ET AL.,[1] PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3325–64, 3330–64—3337–64. Filed April 9, 1968.

*Melvin S. Huffaker, Pell Hollingshead,* and *Roderick K. Daane,* for the petitioners.

*Chauncey W. Tuttle, Jr.,* for the respondent.

OPINION

FAY, *Judge:* Respondent determined deficiencies in petitioners' income tax for the taxable year 1960 as follows:

| Docket No. | Petitioners | Amount |
|---|---|---|
| 3325–64 | Edward W. and Marjorie S. Reid | $8,751.61 |
| 3330–64 | Gertrude S. Rovin | 11,495.94 |
| 3331–64 | Mathilde A. Rovin | 4,069.52 |
| 3332–64 | Dorothy F. Rovin Trust | 1,339.55 |
| 3333–64 | George H. and Mary Sherman | 9,703.28 |
| 3334–64 | Donald C. Sherman | 10,347.27 |
| 3335–64 | George S. and Dorothy F. Rovin | 1,834.07 |
| 3336–64 | Arthur G. and Mary Sherman | 34,813.20 |
| 3337–64 | Arthur G., Jr., and Dorothy W. Sherman | 9,713.62 |

Respondent conceded a part of each issue raised in the pleadings. The issues, as they remain for decision, are: (1) Whether the payments by Sherman Laboratories, a partnership, to Fuller Laboratories, Inc., totaling $124,032.86 during the year ending March 31, 1960, are deductible in the taxable year 1960 by petitioners, partners of

---

[1] Proceedings of the following petitioners are consolidated herewith: Gertrude S. Rovin, docket No. 3330–64; Mathilde A. Rovin, docket No. 3331–64; Dorothy F. Rovin Trust, City National Bank of Detroit, Trustee, docket No. 3332–64; George H. Sherman and Mary Sherman, docket No. 3333–64; Donald C. Sherman, docket No. 3334–64; George S. Rovin and Dorothy F. Rovin, docket No. 3335–64; Arthur G. Sherman and Mary Sherman, docket No. 3336–64; and Arthur G. Sherman, Jr., and Dorothy W. Sherman, docket No. 3337–64.

Sherman Laboratories, as royalty payments under section 162(a);[2] and (2) if the aforedescribed payments are held to be an installment of the purchase price for an intangible asset, rather than royalty payments, whether petitioners are entitled to deduct said payments under section 167(a) for the depreciation of said intangible asset during 1960.

All of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner Dorothy F. Rovin Trust filed its Federal fiduciary income tax return for the taxable year 1960 on a calendar year basis with the district director of internal revenue, Detroit, Mich. The other petitioners filed their Federal individual income tax returns for the taxable year 1960 on a calendar year basis with the appropriate district director of internal revenue within whose jurisdiction each of them lived.

The parties have stipulated that the venue for appeal from any decision by this Court with respect to each of the cases herein is to the U. S. Court of Appeals for the Sixth Circuit.

Sherman Laboratories (hereinafter referred to as Sherman) is a Michigan limited partnership. During 1960 the respective petitioners owned the following interests in Sherman:

| Name | Percentage | Name | Percentage |
|---|---|---|---|
| A. G. Sherman, Sr | 21 | George H. Sherman | 9 |
| M. C. Sherman | 5 | George S. Rovin | 3 |
| Gertrude S. Rovin | 10 | Mathilde A. Rovin | 5 |
| A. G. Sherman, Jr | 8 | D. C. Sherman | 9 |
| D. W. Sherman | 1 | D. F. Rovin Trust | 2 |
| Marjorie S. Reid | 9 | Total | 82 |

The remaining 18-percent beneficial interest was owned by partners who are not parties herein. The limited partnership agreement of Sherman for the year in issue provided that each partner should share in the net profits or losses from the operation of the partnership business proportionately to such partner's total percentage interest therein.

Sherman filed its Federal partnership income tax return for its taxable year ending March 31, 1960, with the district director of internal revenue, Detroit, Mich.

On April 18, 1949, Sherman entered into an agreement (hereinafter referred to as the agreement) with Fuller Laboratories[3] (hereinafter referred to as Fuller). The relevant terms of the agreement are as follows:

---

[2] All statutory references are to the Internal Revenue Code of 1954.

[3] Fuller and Sherman are completely independent of each other with respect to ownership.

This agreement made and entered into * * * between Fuller Laboratories, Inc., * * * hereinafter called "Fuller", and Sherman Laboratories * * * hereinafter called "Sherman."

WHEREAS, Fuller is engaged in the manufacture and sale to the medical profession, drug trade, and others, of a preparation or drug known as, and sold under, the trade-mark PROTAMIDE * * *

WHEREAS, the drug or preparation called PROTAMIDE is manufactured by a secret process and formula owned by, and lawfully known only to, Fuller.

WHEREAS, Fuller desires to increase the distribution, sale and use of PROTAMIDE and to be relieved of the manufacture, promotion, distribution and sale thereof, which functions Sherman desires and is willing to perform.

*       *       *       *       *       *       *

Now, THEREFORE, in consideration of the above premises, the covenants hereinafter recited and the faithful performance of the same, and for other good and valuable consideration, it is agreed as follows:

1. Fuller will disclose its secret method, secret formula and secret "know-how" for the manufacture of PROTAMIDE to George H. Sherman * * * so that said George H. Sherman, acting on behalf of Sherman, * * * can manufacture PROTAMIDE * * *

2. Fuller hereby grants Sherman the exclusive right to manufacture and sell PROTAMIDE throughout the world in accordance with said secret method, formula and "know-how".

3. Fuller, by a separate instrument in writing, will assign and transfer unto Sherman the entire right, title and interest in and to the trade-mark PROTAMIDE and the good-will of the business in connection with which the mark is used and Sherman agrees that upon the termination of this agreement, * * * that ipso facto all said trade-mark rights and said good-will will revert to Fuller * * *. Sherman also agrees that it will advertise and sell the drug or preparation PROTAMIDE solely under the trade-mark PROTAMIDE and that it will prominently display the trade-mark insofar as practical by label or otherwise upon all ampules and all containers in which PROTAMIDE is packaged for sale * * *

4. Fuller will furnish Sherman with a card index of all of Fuller's customers for PROTAMIDE and complete clinical reports and experimental data useful in the sale of PROTAMIDE and upon termination of this agreement Sherman will promptly furnish Fuller with a card index of all of Sherman's customers for PROTAMIDE and any additional clinical reports and experimental data useful in the sale of PROTAMIDE which Sherman has acquired during the life of this contract.

5. Sherman agrees that it will pay to Fuller a license fee or royalty computed at the rate of ten percent (10%) of Sherman's net selling price to hospitals, clinics, doctors, drug stores, and others of each ampule or not less than ten cents (10¢) per ampule, whichever shall be greater, for each and every ampule of PROTAMIDE sold * * *. The computation of royalty shall be based on the total net dollars sales and the total net number of ampules shipped * * *. If PROTAMIDE is sold in any other form or size than the present 1.3 cc size ampule, then the royalty rate shall be negotiated between the parties so as to provide Fuller a royalty equivalent to that which it would receive if the PROTAMIDE were sold in 1.3 cc size ampule. PROTAMIDE distributed directly or through salesmen free of charge to hospitals, clinics, or doctors for clinical trial to promote the sale of PROTAMIDE shall be royalty free.

*       *       *       *       *       *       *

6. Sherman agrees to keep complete and accurate accounts of all data required for the computation of the license fee or royalty * * * and on or before the last days of April, July, October and January of each year transmit to Fuller a statement in writing showing in reasonable detail the amount of the license fee or royalty accruing during the preceding quarter-annual period, together with the remittance for the amount accruing for such period. * * *

7. Sherman agrees that Fuller, or its authorized agent, from time to time shall have the right to examine its books and records to such extent as may be necessary to determine the accuracy or inaccuracy of any royalty statements submitted by Sherman to Fuller * * *

8. Sherman agrees to use its best efforts to further the manufacture and sale of PROTAMIDE and to maintain an efficient organization for the manufacture and promotion of the sale of PROTAMIDE. The manufacture, pricing and sales promotion of PROTAMIDE shall be completely controlled by Sherman. Sherman agrees to maintain adequate product liability insurance on all PROTAMIDE sold.

9. Sherman agrees that all PROTAMIDE will be manufactured personally by George H. Sherman and George H. Sherman agrees forever to regard as, and maintain, strictly confidential and secret, and not to disclose to the other of said partners or any one else, all information obtained or received from Fuller relating to the method of preparation or manufacture of PROTAMIDE, formula used therein, and any other "know-how" relating to the manufacture of PROTAMIDE. If accidentally, or otherwise, any other partner or partners obtain any knowledge of said secret method, secret formula and secret "know-how" for the manufacture of PROTAMIDE, said other partner or partners agree forever to regard as, and maintain, strictly confidential and secret all such knowledge and not to disclose the same to any other partner or partners or third persons. If George H. Sherman ceases to be a partner, then the remaining partners shall elect another partner to stand in his stead and perform the duties and assume the obligations specified in this Paragraph and immediately notify Fuller of such election.

10. Fuller agrees that during the life of this contract, or any extensions thereof, it will not disclose to any other party the method of preparation of PROTAMIDE, the formula used therein and the "know-how" relating to the manufacture of PROTAMIDE, and will not engage in the distribution of PROTAMIDE except through Sherman.

11. Sherman agrees that if it, or any of its employees, makes, develops or invents improvements on the method, formula or "know-how" relating to PRO-TAMIDE as disclosed to Sherman by Fuller, such improvements shall be maintained strictly secret and promptly assigned and disclosed by Sherman only to Fuller and Sherman will pay Fuller the same royalties as specified in this contract, Paragraph 5, on any and all such product made in accordance with any such improvements and sold or shipped by Sherman to fill orders. Sherman agrees that during the life of this contract it will not develop and market a competing product having as its basis the process, formula, or "know-how" disclosed by Fuller to Sherman except with permission of Fuller and upon payment to Fuller of royalties upon said competing product in accordance with the rate provided in Paragraph 5 hereof * * *

12. Fuller will use its best effort to provide clinical aid to Sherman in potency testing of any lots of PROTAMIDE through contacts now available to Fuller.

13. This agreement shall be subject to termination by either party upon default by the other party in the performance of any of the terms, conditions or covenants of this agreement and failure to remedy said default within thirty (30) days after

notice or demand * * *. Termination of this agreement in any manner shall not discharge the liability of Sherman for royalties accrued or unpaid at the time of such termination.

   *        *        *        *        *        *        *

15. This agreement shall, unless otherwise cancelled, as provided above, exist for a term of fifteen (15) years, but shall be renewable for fifteen year contract terms at the option of Sherman by giving Fuller written notice of such intent on the part of Sherman on or before six (6) months prior to the expiration of each and every fifteen (15) year contract term.

16. Fuller will designate an agent or agents to deal with Sherman on all secret matters appertaining to PROTAMIDE and will give Sherman a certified copy of such designation and such agent or agents shall have the right to inspect Sherman's laboratory notes relating to the manufacture of each run or batch of PROTAMIDE.

On October 29, 1949, Sherman and Fuller amended the agreement. The amendment dealt with the method of computing payments due from Sherman to Fuller.

On August 1, 1961, Sherman and Fuller amended the agreement again. The amendment was the product of several discussions between Sherman and Fuller. The amendment created a right in Sherman to sell the drug in foreign countries under the trade name "Neuramide" and also dealt with Sherman's right to sell the drug in foreign countries under the trade name "Protamide." Sherman's rights to sell the drug in foreign countries were limited by and conditioned upon its performance of numerous and detailed actions, sometimes to the satisfaction of Fuller. Futhermore, several situations were set out where Sherman had to get Fuller's permission or consent to proceed with foreign marketing of the drug. Finally, the amendment dealt with the method of computing payments due from Sherman to Fuller on foreign sales. The amendment referred to these payments as "license fees or royalties."

On June 3, 1963, Sherman and Fuller amended the agreement for the third time. This amendment created a right in Sherman to sell the drug in foreign countries under the trade name "Neurasherm." With respect to conditions and limitations on marketing the drug abroad, this amendment was very similar to the one of August 1, 1961.

On December 30, 1965, Sherman and Fuller amended the agreement for the fourth time. This amendment created a right in Sherman to sell the drug in foreign countries under the trade name "Nerpemide." With respect to conditions and limitations on marketing the drug abroad, this amendment was very similar to the one of August 1, 1961.

Sherman and Fuller have complied with the agreement, as amended, from April 19, 1949, to the date of the trial herein. During this period the market for Protamide has increased considerably. In the year prior to the execution of the agreement Fuller's sales of the drug totalled $13,000. During the year ending March 31, 1960, Sherman's sales of the drug totaled $1,240,328.56.

In the late 1950's, Sherman began developing a program of international sales of Protamide. Pursuant to the agreement, as amended, Sherman has been required from time to time to procure Fuller's permission of authorization to proceed with various actions relative to its international sales. For example, in September 1961, Sherman had to get Fuller's permission to export Protamide to Italy in bulk liquid form rather than in separate ampules. And in January 1963, Sherman had to get Fuller's permission to export Protamide into Brazil in bulk liquid form.

No patent has ever been issued or applied for with respect to Protamide. In the year prior to the execution of the agreement, Fuller took great pains to keep secret the process for manufacturing the drug. Since the execution of the agreement, Sherman and Fuller have continued to preserve the secrecy of the process. To this end, George H. Sherman has personally manufactured all Protamide sold by Sherman, as required by the agreement.

On February 4, 1963, Sherman wrote a letter exercising its option to extend the term of the agreement for 15 years. On August 12, 1963, Fuller acknowledged receipt of the letter and accepted it as a valid exericse of Sherman's option to renew. The term of the agreement was then extended until April 18, 1979.

Since the execution of the agreement in 1949, Sherman has treated the agreement as a license for tax purposes and has deducted its payments to Fuller as a royalty expense on its Federal income tax returns. From 1949 through 1960, Fuller also treated the agreement as a license and reported its receipts from Sherman as royalty income on its Federal income tax returns. Subsequent to filing its 1960 return, however, Fuller filed claims for refund for its taxable years 1955 through 1960 which were determined by treating the agreement as a sale and by treating the receipts from Sherman as long-term capital gain rather than as ordinary income. Soon thereafter respondent formally denied these claims for refund, thereby taking the position with respect to Fuller that the agreement is a license. On July 10, 1962, Fuller filed a petition in the Court of Claims of the United States [4] seeking the refund which respondent had denied. Fuller's petition was dismissed pursuant to a stipulation by the parties on December 7, 1966.

Since the execution of the agreement in 1949, Sherman and Fuller have, in their correspondence with each other, continually referred to the agreement as a "license agreement" and to the payments thereunder as "license fees or royalties." For example, in 1966 Fuller wrote a letter to Sherman containing the following paragraph:

---

[4] Respondent mailed the statutory notices of deficiency in the cases at bar on Apr. 15, 1964.

Re: License Agreement between Fuller Laboratories, Inc., and Sherman Laboratories, dated April 18, 1949, as amended by Amendments thereto dated, respectively, August 1, 1961 and June 3, 1963 (the Amended License Agreement)

Furthermore, Fuller's attorney, in his correspondence relating to Fuller, has referred to payments under the agreement as "royalties." For example, in a letter to Sherman's attorney dated December 24, 1962, Fuller's attorney wrote:

said Board of Directors empowered its officers to enter into an Agreement with Sherman Laboratories amending the existing Agreement between our client and Sherman Laboratories dated April 18, 1949, so as to make the minimum royalty, payable thereunder in respect of the drug or preparation Protamide exported by Sherman Laboratories in powdered form, referable to the number of grams of protein contained in any given quantity of Protamide in powdered form * * *

During its taxable year ending March 31, 1960, Sherman paid $124,032.86 to Fuller pursuant to the agreement. The amount of the payments was based entirely on a percentage of Sherman's sale of Protamide during its fiscal year. Sherman deducted said amount as a royalty expense on its Federal income tax return.

In their Federal income tax returns for 1960, petitioners took into account their respective shares of Sherman's deduction for royalty expense in computing their respective distributive shares of partnership income.

In his statutory notices of deficiency for the taxable year 1960, respondent increased petitioners' respective distributive shares of partnership income on the ground that Sherman's payments to Fuller were not deductible expenses.

The first issue for decision is whether Sherman's payments totaling $124,032.86 to Fuller during the year ending March 31, 1960, are deductible in the taxable year 1960 by petitioners as royalty payments under section 162(a). The resolution of this issue turns upon the question of whether the agreement, as amended, is a sale or a license. If the agreement is a sale, Sherman's payments thereunder are not royalties and petitioners cannot deduct the payments under section 162(a). If the agreement is a license, Sherman's payments are royalties and petitioners may deduct them under section 162(a). See *J. Strictland & Co.* v. *United States*, 352 F. 2d 1016, 1017 (C.A. 6, 1965).

In deciding that a contract was a license, not a sale, for tax purposes, the Court of Appeals in *Pickren* v. *United States*, 378 F. 2d 595, 599 (C.A. 5, 1967), said:

The cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties and then, so far as it is possible so to do consistently with legal principles, give effect to that intention. * * *

Pursuant to this rule, we must look to the agreement and to the actions of Sherman and Fuller to determine whether they intended to enter into a sale or a license.

There is evidence in the record which supports both sides of the question of whether the agreement is a license or a sale. We think, however, that the preponderance of the evidence sustains petitioners' position that the agreement is a license.

The agreement and the amendments thereto are written in language which is appropriate to a license. Payments under the agreement are described as "license fees or royalties." The amount of the payments is determined as a percentage of net sales, with a minimum of 10 cents per unit sold. Furthermore, paragraph 1 of the agreement is written in terms of a "disclosure" by Fuller to Sherman of the secret process, not in terms of a "transfer" or "sale" of the secret process. In other words, the agreement only purports to give Sherman the right to use the secret process; it does not purport to transfer to Sherman the ownership of the process. While the language used in the agreement is not determinative of the question presented, it is a significant factor to consider in ascertaining the intent of Sherman and Fuller. *Pickren* v. *United States*, *supra* at 600. See also *Charles E. Kaltenbach* v. *United States*, 66 Ct. Cl. 581 (1929).

The preamble to the agreement contains the following paragraph:

WHEREAS, Fuller desires to increase the distribution, sale and use of PROTA-MIDE and to be relieved of the manufacture, promotion, distribution and sale thereof, which functions Sherman desires and is willing to perform.

This paragraph connotes an intent to have manufacturing and marketing responsibilities assumed by Sherman without Fuller's relinquishing its ownership of the secret formula. This intention is especially significant because it appears in an introductory paragraph of the agreement and because the introductory paragraphs explain the reasons for entering into the agreement. See *Pickren* v. *United States*, *supra* at 600.

In paragraph 9 of the agreement there is a detailed provision to insure that Sherman cannot and will not, under any circumstances, disclose the secret of the Protamide formula to anyone else. Indeed, the agreement provides that George H. Sherman, a partner of Sherman, is the only person in Sherman's organization lawfully entitled to know the secret formula. Not even the other partners are permitted to learn the secret. Furthermore, George H. Sherman promises in the agreement forever to keep secret the Protamide formula. Finally, each of the other partners promises in the agreement that if he accidentally learns the secret formula, he will refrain absolutely from disclosing it forever. The significance of such emphasis on permanent nondisclosure of a secret process was pointed out in *Commercial*

*Solvents Corporation*, 42 T.C. 455 (1964). In that case, the facts with respect to nondisclosure of a secret process by the user thereof were substantially the same as those in the case at bar. In holding that the agreement in *Commercial Solvents* was a license, not a sale, the Court, at page 468, said:

Furthermore, under paragraph (9) of the agreement, Kyowa [the user] could make no disclosure of the secret process to anyone, not even to anyone in Japan, without prior permission in writing from petitioner [the discoverer]. This is not indicative of a sale of the process from petitioner to Kyowa. * * * [5]

Prior to the execution of the agreement, Fuller took great pains to safeguard the secret of the Protamide process. This secrecy was preserved in the agreement with the permanent nondisclosure duties placed upon Sherman and its partners.[6] This striving for secrecy on the part of Fuller indicates that it intended to preserve its property rights in the trade secret for possible future use—an intent which is consistent only with a license, not a sale. Compare the facts in *Charles E. Kaltenbach, supra.* Furthermore, the permanent nondisclosure duties in the agreement are placed upon Sherman and its partners, not upon Fuller. This indicates that the parties to the agreement intended Fuller, not Sherman, to own the residual rights in the secret process.[7]

The practical construction which Sherman and Fuller have placed upon the agreement by their actions is significant in deciding whether they intended to enter into a license or a sale. *Pickren* v. *United States*, at 600. They have amended the agreement four times. We think the flexiblity exhibited by entering into these amendments indicates that Sherman and Fuller view themselves as having a continuing business relationship subject to adjustment. This type of relationship is much more like a license than a sale. Furthermore, Sherman has consistently treated the agreement as a license for tax purposes since its execution in 1949. Fuller consistently treated the agreement as a license for tax purposes until after filing its 1960 return, at which time it changed to treating it as a sale. Fuller's change in treatment does not detract from the fact that for more than 10 years both it and Sherman treated the agreement as a license for tax purposes. We think this initial treatment best indicates the intention of both Fuller and Sherman. Finally, Sherman and Fuller, in their correspondence with each other, have continually referred to the agreement as a "license agreement" and to the payments thereunder as "license fees or royalties." Fuller's attorney, in his correspondence relating to

---

[5] Compare *E. I. duPont deNemours & Co.* v. *United States,* 288 F. 2d 904 (Ct. Cl. 1961) ; *Stalker Corporation* v. *United States,* 209 F. Supp. 30 (E.D. Mich. 1962).

[6] Par. 10 of the agreement contains nondisclosure provisions in regard to Fuller. These are not, however, provisions for permanent nondisclosure.

[7] Compare Fromson, "The Safeguarding of Trade Secrets—Your Elusive Asset," 40 N.Y. St. B. J. 61 (1968).

Fuller, has referred to payments under the agreement as "royalties." Some of these references, notably some in a letter written by Fuller in 1966, occurred after Fuller changed its tax treatment of the agreement. We think these references are strong evidence that Sherman and Fuller view their agreement as a license, not a sale.

In the agreement, as amended, Fuller retains various rights with respect to Sherman's use of the secret process Fuller has, for example, a right to inspect Sherman's laboratory notes relating to its manufacture of each batch of Protamide. In addition, Fuller retains an elaborate set of controls over Sherman's international sales of Protamide. We think the retention of rights such as these with respect to Sherman's use of the secret process is more consistent with an intent to enter into a license than with an intent to enter into a sale.

In the agreement, as amended, there are various duties and restrictions imposed on Sherman with respect to its use of the secret formula. Sherman is, for example, required to maintain product liability insurance on all Protamide which it sells. Furthermore, Sherman is restricted as to the names under which it can advertise and sell the drug. We think duties and restrictions of this sort are indicative of an intent to enter into a license, not a sale.

Fuller retained various rights to the secret process in the agreement. For example, it retained rights to intangible assets related to Protamide, such as trademarks and customer lists, which rights vest when the agreement ends. Fuller also has a right when the agreement ends to keep any developments and improvements of the secret process which Sherman might discover during the term of the agreement. These rights are more consistent with an intent to enter into a license than with an intent to enter into a sale.

Viewing the record as a whole, and particularly the factors discussed above, we think Sherman and Fuller intended to enter into a license, not a sale. Pursuant to the intent rule of *Pickren*, which rule we previously quoted, we conclude that the agreement, as amended, is a license for tax purposes.

Furthermore, as we construe paragraphs 2 and 10 of the agreement, Fuller retains a right to manufacture Protamide, although it can only distribute the drug through Sherman. While paragraph 2 grants to Sherman an "exclusive right to manufacture" Protamide, we think it must be interpreted, in view of the last three words in paragraph 10, to mean "exclusive as to all parties except Fuller." It follows that the agreement, as amended, does not meet the time-honored test of a sale enunciated in *Waterman* v. *Mackenzie*, 138 U.S. 252, 256 (1891):

a grant of an *exclusive* right to make, use and vend * * * [a] patented * * * [article] is an assignment, and gives the grantee the right to sue in his own name for an infringement * * * [Emphasis supplied.]

As the law applicable to patents is akin to the law applicable to trade secrets, the failure of the agreement to measure up to the *Waterman* test of a sale is a further indication that it is a license for tax purposes. *Commercial Solvents Corporation, supra* at 468.

Because of our conclusion on the *Pickren* intent test, and because of our conclusion on the *Waterman* test, we hold that the agreement, as amended, is a license. It follows that petitioners are entitled to deduct as royalties under section 162(a) Sherman's payments totaling $124,032.86 to Fuller.

In view of our disposition of the first issue, it is not necesary to discuss the second issue raised by the pleadings.

*Decisions will be entered for the petitioners.*