NASSAU SUFFOLK LUMBER & SUPPLY CORPORATION, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3680-67, 3727-67, 1878-68, 3961-68. Filed November 24, 1969.

*Lyle A. Marshall*, for the petitioner in docket Nos. 3680-67 and 1878-68.

*Howard A. Rumpf*, for the petitioners in docket Nos. 3727-67 and 3961-68.

*Jay S. Hamelburg*, for the respondent.

### OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in petitioners' income tax as follows:

| Petitioner | Year | Deficiency |
|---|---|---|
| Nassau Suffolk Lumber & Supply Corp.: | | |
| Docket No. 3680-67 | 1961 | $1, 112. 10 |
| | 1962 | 2, 715. 22 |
| | 1963 | 2, 025. 00 |
| Docket No. 1878-68 | 1964 | 1, 850. 00 |
| | 1965 | 1, 727. 30 |
| George J. and Annette C. Koopmann: | | |
| Docket No. 3727-67 | 1960 | 3, 378. 67 |
| | 1961 | 2, 773. 43 |
| | 1962 | 3, 720. 74 |
| | 1963 | 3, 689. 74 |
| Docket No. 3961-68 | 1964 | 3, 969. 10 |
| | 1965 | 3, 992. 18 |
| | 1966 | 3, 831. 18 |

The cases have been consolidated for trial and involve the tax treatment of annual payments made to petitioner Nassau Suffolk Lumber & Supply Corp. (Supply) by the Nassau Suffolk Fuel Corp. (Fuel), a subchapter S corporation, the stock of which was owned by petitioners George J. Koopmann (Koopmann) and his wife, Annette C. Koopmann. The positions of Supply and the Koopmanns

---

[1] Cases of the following petitioners are consolidated herewith: George J. and Annette C. Koopmann, docket Nos. 3727-67 and 3961-68; and Nassau Suffolk Lumber & Supply Corp., docket No. 1878-68.

are antagonistic to one another, and the real controversy herein is between them. The Government's position is similar to that of a stakeholder and it took inconsistent positions initially merely to protect the revenues. The payments herein were made subsequent to Koopmann's purchase of Supply's fuel business. The question presented is whether such payments represented part of the sale price and therefore constituted long-term capital gain to Supply and non-deductible capital expenses to Fuel, or whether they simply represented proceeds from Supply's retained interest in the earnings of the fuel business and were thus taxable to Supply as ordinary income and deductible by Fuel as ordinary and necessary business expenses. The facts have been stipulated.

Supply has its principal place of business and principal office in Huntington Station, N.Y. Until 1954, in conjunction with its lumber business and other activities, it operated a fuel business in Huntington, N.Y., which distributed coal and oil. It filed its Federal corporate income tax returns for the years 1961 through 1965 with the district director of internal revenue, Brooklyn, New York.

The Koopmanns are husband and wife. They filed joint Federal income tax returns for the calendar years 1960 through 1966 with the district director of internal revenue, Brooklyn, New York, and were legal residents of Huntington Station, N.Y., at the time the petitions were filed in this case.

On October 26, 1954, Koopmann entered into an agreement with Supply for the purchase of Supply's fuel business in Huntington. Under the terms of the sale instrument, Supply agreed to sell certain customer lists, coal inventory, rolling equipment, and yard equipment to Koopmann. It also promised to provide Koopmann with an extension to its telephone whereby it would transmit incoming calls to him or his assigns. Moreover, Supply covenanted not to engage in the coal or oil business within the town of Huntington as long as the contract remained in effect. In addition, Supply made representations with respect to the volume of its sales of coal and fuel during 1953 and 1954 on which it was understood that Koopmann relied.

In return, Koopmann promised to pay $5,000 to Supply at the signing of the agreement, $4,787.50 on November 1, 1954, when title would pass, and $14,000 in promissory notes from either Koopmann or his assigns. The notes were to be in the amount of $350 each and payable monthly, *seriatim*, commencing on December 10, 1954. The sale agreement further provided that the notes would be payable with interest computed at 6 percent per annum and would include an acceleration clause which would take effect in the event of default. The notes were to be secured by a mortgage on equipment and rolling stock. The agreement also declared that "The total sales price of

$23,787.50 is based upon an estimated coal inventory of $10,000.00," and provision was made for adjustment in the purchase price to reflect the actual amount of coal inventory as of the closing date.

In addition, Koopmann agreed to pay "As further consideration for this sale" an annual "license royalty" for the next 99 years. The royalty was set at $0.005 per gallon of fuel oil sold and $0.50 per ton of coal sold. In no event, however, would the annual royalty be less than $7,500. Moreover, if the annual royalty exceeded $9,100, then such excess was payable at 50 percent of the above "royalty" rate.

The sale agreement also provided that Koopmann or his assigns would "carry such insurance for the protection of [Supply] * * * as from time to time may be necessary in the discretion of the officers of [Supply] * * *." Moreover, the agreement declared that it was the understanding of the parties that "so long as is practicable [Koopmann] * * * or his assigns shall be permitted to insure under the blanket policies of [Supply] * * *."

The agreement further provided that in the event that Koopmann ever desired to resell the fuel business, it first had to be offered to Supply for repurchase. If Supply declined to exercise its option within 30 days, Koopmann would then have 6 months to sell the business. In addition, it was agreed that Koopmann could be relieved of all liability under the contract by securing Supply's approval of the subsequent purchaser, and that such approval would not be be unreasonably withheld.

The sale agreement also declared that under a separate agreement with the Lumber Realty Corp. (Realty) Koopmann had already arranged to lease the premises on which the fuel business was located. The lease was not introduced and the only information about Realty in the record is contained in Supply's Federal corporate income tax returns for the years 1961 through 1965, which reveal that during those years Supply owned a certain fixed amount of stock in Realty and that Realty held between 76.92 percent and 79.5 percent of Supply's voting stock. Four of the returns stated that the latter stock was acquired at "various" times, and the return for 1961 declared that such acquisitions were made during "1960 and prior" years. In addition, Supply's returns also reveal that between 1961 and 1965 Supply and Realty used the same address: 4 Broadway Plaza West, Huntington Station, N.Y.

On October 26, 1954, the date on which the sale agreement was signed, Koopmann assigned the agreement to Fuel. During each of the years from 1960 through 1966 Fuel paid Supply $7,500 as a "royalty." On its Federal income tax Forms 1120-S for 1960 through 1966, Fuel deducted the $7,500 as "Royalties," as part of "Costs of Goods Sold." In his statutory notices of deficiency to the Koopmanns, the Commissioner,

in addition to other uncontested adjustments, determined that their shares of the undistributed taxable income of Fuel for 1960 through 1966 should be increased on the ground that the payments were nondeductible capital expenditures.

On its corporate income tax returns for 1961 through 1965, Supply reported the receipt of the $7,500 payments as long-term capital gains from the "Sale of coal department, Huntington, N.Y." In his deficiency notices to Supply, the Commissioner, in addition to other uncontested adjustments, determined that the payments received were ordinary income rather than gain from the sale of a capital asset.

The Commissioner does not contend that we should sustain both deficiencies. Rather he asks only that we adopt one position or the other so that Supply and the Koopmanns are treated consistently. However, in response to a request by the Court that he advise the Court as to which of the two positions he favors, the Commissioner now argues on brief that the annual payments were "in the nature of receipts from a retained interest in the earnings of the business, being in effect a license or franchise payment taxable as ordinary income." We agree.

Cases of this character turn to a considerable extent upon their particular facts, cf. *United States* v. *Wernentin*, 354 F. 2d 757, 766 (C.A. 8). Ordinarily, in attempting to determine the true nature of the transaction we seek to ascertain not only the intentions of the parties themselves as revealed by the words of their agreement, cf. *Pickren* v. *United States*, 378 F. 2d 595, 599 (C.A. 5) ; *Edward W. Reid*, 50 T.C. 33, 39–40, but also the substance of what they have put together. *Bryant* v. *Commissioner*, 399 F. 2d 800, 804–805 (C.A. 5) ; *Vermont Transit Co.*, 19 T.C. 1040, 1042–1044, affirmed 218 F. 2d 468 (C.A. 2).

The language of the agreement before us is inconclusive. Notwithstanding the recital that Koopmann wished to "purchase" and Supply wished to "sell" the fuel business, the agreement at the same time characterized the annual payments as a "license royalty." Similarly, it stated that $23,787.50 was to be "the total sales price"; yet it also described the royalty payments as "further consideration for this sale." In view of the confusing language used we find little help from the terminology of the agreement, although to a certain extent the words "license royalty" appear to overshadow other language in the agreement as applied to the particular payments in issue.

We turn to a consideration of the substance of the rights and obligations created under the agreement, and we note that in a somewhat similar situation the Court of Appeals in *Bryant* v. *Commissioner*, 399 F. 2d 800, 805–806 (C.A. 5), took into account three factors in determining whether certain future payments represented part of the purchase price: (1) Whether the payments were limited to a specific

amount thus indicating that they were merely components of a purchase price; (2) whether the duration of the payments was a short term ("If limited to a short term and a sum certain, they are less likely to be deemed attributable to continued ownership by the seller"); and (3) whether interest accrued on the unpaid balance. While no one of these factors may be determinative, all of them support the Koopmanns' position in the present case, and upon considering them together with other materials in the record we have concluded that the payments did not represent part of the purchase price.

The amount of the "license royalty" was unlimited. Although minimum payments of $7,500 a year were required, there was no maximum payment. The only restriction was a partial reduction in the royalty rate for any year in which the royalty payment exceeded $9,100. While the absence of a ceiling is certainly not conclusive, cf. *Vermont Transit Co.*, 19 T.C. 1040, affirmed 218 F. 2d 468 (C.A. 2), certiorari denied 349 U.S. 945, it nevertheless suggests that Supply's interest more closely resembled that of a participant in the enterprise.

Of particular significance is the 99-year period over which the payments were to be made. A 99-year period in the context of this case is so lengthy that Supply's interest in the enterprise was undoubtedly looked upon for practical purposes as virtually a permanent one. The relevance of the length of the period was stressed not only in *Bryant* but was particularly noted in *Moberg* v. *Commissioner*, 365 F. 2d 337 (C.A. 5), where the court, in holding that certain gallonage payments were taxable as ordinary income rather than capital gain, stated: "The longer the payments are spread out * * *, the more the payments resemble a continuing interest in the * * * business transferred." 365 F. 2d 337, 340.[2]

The third factor noted in *Bryant* also points to the conclusion that the payments before us were not part of the purchase price but represented Supply's income from a continuing interest in the venture. Notwithstanding that the agreement meticulously provided for interest on the unpaid promissory notes which concededly were part of the purchase price, it made no similar provision with respect to the royalty payments.

Other considerations in the present record reinforce the conclusion reached upon the basis of the foregoing three factors. Thus, Supply's right of "first refusal" contributed an added degree of permanence to

---

[2] Since patent rights were transferred in *Moberg*, the court in that case felt it necessary to explain why sec. 1235, I.R.C. 1954, which authorizes capital gain treatment of periodic payments received in exchange for patent rights, did not control the disposition of that case, 365 F. 2d at 340. The reasoning of *Moberg* is even more persuasive where, as here, sec. 1235 is inapplicable.

its retained interest in the venture. By maintaining a first option to "repurchase" the fuel business whenever it was offered for sale, Supply assured itself that *full* ownership of the enterprise would continue to be potentially within its reach. Also, if the business were resold by Koopmann to someone else, it would probably be burdened by the continuing obligation to make the royalty payments to Supply, for Koopmann would be relieved of all liability in that respect upon Supply's approval of the purchaser, an approval that it contracted it would not unreasonably withhold. In addition, it was plainly contemplated that the business would be carried on at the same location, for Koopmann was simultaneously given a lease of the business premises by a corporation closely related to Supply. Moreover, the agreement even contained a provision whereby Supply provided the fuel business with an extension to its telephone so that it could transfer incoming calls to that extension. Such arrangements suggest a continuing business relationship between Supply and the fuel business and indicate further that it did not completely divorce itself from the daily operations of that business. Cf. *Edward W. Reid*, 50 T.C. 33, 41.

We conclude that Supply did not divest itself of its entire interest in the fuel business. It retained a continuing interest in the enterprise, and the "royalty" payments represented its return on that interest. Supply might be considered as having a status in the nature of a "licensor," a "franchisor," or a "lessor." But the label that might be used to describe the relationship between Supply and Fuel is not particularly important. What is significant is Supply's retained interest in the continuing success of the enterprise. The "royalty" payments are taxable to it as ordinary income and are deductible by Fuel. See *Moberg v. Commissioner*, 365 F. 2d 337 (C.A. 5) (ordinary income) ; *Edward W. Reid*, 50 T.C. 33 (deductible expenses).

Supply contends that the "royalty" payments were made in exchange for the goodwill of the business. Therefore, it argues, the payments should be treated as made in exchange for a capital asset and taxed at capital gain rates. In advancing this argument, it relies on *J. Strickland & Co. v. United States*, 352 F. 2d 1016 (C.A. 6), certiorari denied 384 U.S. 950, for the proposition that the label, "license royalty," is not determinative of the tax consequences of the transaction. We do not question the soundness of that proposition. In *Strickland* the court found that a purported "royalty" arrangement was nothing but a thinly disguised sale designed to enable the buyer to deduct his payments as ordinary and necessary business expenses. Similarly, our opinion herein does not rely on the label but rather examines the substance of the agreement. Nothing in *Strickland* is inconsistent with our

conclusion. Moreover, it is open to serious question whether Supply did in fact sell its goodwill. To be sure, the agreement includes Supply's customer lists, but it does not mention goodwill. Customer lists may of course be an important aspect of goodwill, but goodwill may well mean much more. Although the materials before us are scanty, they strongly suggest that the fuel business was but a minor aspect of Supply's overall business, that it was a well-established company, that it continued to conduct its affairs generally at the same address after the sale to Koopmann, that considerable goodwill attached to its name which was of substantial value to it after the sale, that the new owner conducted the fuel business at the same premises which were previously used for that branch of Supply's operations, that Supply permitted the new owner of the fuel business to use a name similar to its own, and that those customers (or at least some of them) who ordered their fuel by telephone would continue to call Supply's number and would be connected to the fuel branch through an extension. It seems likely to us that a substantial amount of goodwill—indeed a crucial amount— remained with Supply after the sale, and that Supply continued to reap the benefits thereof through the medium of the royalty arrangement.

Supply also relies on *Aaron Michaels*, 12 T.C. 17, acq. 1949–1 C.B. 3, and *Toledo Newspaper Co.*, 2 T.C. 794, acq. 1944 C.B. 28, for the proposition that when an agreement not to compete accompanies the transfer of goodwill in the sale of a business and when the covenant is deemed integral to the transferred goodwill, the proceeds from the covenant should be taxed at capital gain rates. These cases have little bearing on the question before us. In those cases, there were no findings that the seller retained an interest in the business he sold. The courts' task was simply to allocate the purchase price between goodwill and the covenant not to compete. Also, as indicated above, there is substantial doubt whether there was a transfer of goodwill here.

Even if there were a transfer of goodwill, Supply has offered no evidence to show that its covenant not to compete was, in a practical sense, "integral" to such transfer. Moreover, no portion of the payments described by the sale agreement were attributed to either the sale of goodwill or the covenant not to compete. Since we have found that Supply retained an interest in the fuel business, and since Supply has shown no basis for allocating any of the "royalty" payments to the sale of goodwill, we must sustain the Commissioner's determination that all of the "royalty" payments are taxable as ordinary income. *Lasell* v. *United States*, 186 F. Supp. 510 (N.D. Calif.).

*Decisions will be entered under Rule 50.*