OPINION Naum, Judge: The dispute between petitioner and the Commissioner centers on whether during the years in issue Pan American retained an “economic interest” in the properties transferred to Pacific. The parties appear to agree that if Pan American retained an economic interest in the properties, Pan American’s receipts in 1958 and 1959 represent ordinary income to it, subject to depletion, but that if it retained no such interest, the receipts reflect capital gain realized by Pan American on the sale of property used in its trade or business. The petitioner contends that as of January 1, 1958, Pan American did not look solely to the extraction of gas from the assigned properties for payment of the total consideration of $134,619,000, and that therefore, according to Anderson v. Helvering, 310 U.S. 404, it did not retain an “economic interest” in the properties. The Commissioner’s response is twofold. First, he argues that in fact Pan American did look solely to the assigned properties’ gas production as the source of the deferred payments. Secondly, he contends that even if the properties’ gas production were not the sole source of the payments, the facts of this case are distinguishable from those of Anderson v. Helvering, supra, in that here the total consideration of $134,619,000 was far in excess of any amount Pan American could reasonably have expected to derive from contracts and that by setting such a large amount as the total consideration, Pan American reserved to itself a permanent interest in the assigned properties and thus did not dispose of them by sale. Because we agree with the Commissioner’s first contention and although much of the parties’ efforts at the trial herein attempted to establish the amount of revenue which Pan American could reasonably 'have expected to receive under the contracts, we find it unnecessary to consider the Commissioner’s second argument. The concept of “economic interest” is generally regarded as having been introduced in 1933 in Palmer v. Bender, 287 U.S. 551. In that case, the taxpayer was a member of two partnerships. Each partnership had acquired oil and gas leases and assigned part of the leased properties to a third party in consideration of a present payment of a cash bonus, a future payment to be paid “out of one-half of the first oil produced and saved” to the extent of a named sum, and an additional “excess royalty” of one-eighth of all the oil produced and saved. The taxpayer claimed that all three types of payments were taxable to him as ordinary income subject to depletion, while the Government contended that the assignments were sales and that the only allowable deduction was the cost of the properties. In holding for the taxpayer, the Supreme Court declared (287 U.S. at 557): the lessor’s right to a depletion allowance does not depend upon his retention of ownership or any other particular form of legal interest in the mineral content of the land. It is enough if, by virtue of the leasing transaction, he has retained a right to share in the oil produced. If so he has an economic interest in the oil, in place, which is depleted by production. A taxpayer, the Court announced, has an economic interest in every case where he “has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of oil, to which he must look for a return of his capital.” 287 U.S. at 557. Four years later, in Thomas v. Perkins, 301 U.S. 655, the Court considered the tax consequences of a similar transaction upon an assignee of certain oil and gas leases. In that case, the assignment instrument recited that the assignors (301 U.S. at 657) in consideration of the sutm of Ten Dollars ($10.00) cash[1] * * * and of the further sum of Three Hundred Ninety Five Thousand Dollars ($395,000.00) to be paid out of the oil produced and saved from the * * * lands, and to be one-fouirth of all the oil produced and saved * * * .until the full sum * * * is paid, * * * do hereby bargain, sell, transfer, assign, and convey all our rights, title, and interest in and to said leases and rights thereunder. After describing the assigned properties, the instrument further provided that the $395,000 payment (301 U.S. at 657)- — ■ is payable out of oil only, if, as and when produced from said lands above described, and said oil payment does not constitute and shall not be a personal ohligation of the assignee, its successors or assigns. The assignee did not include in taxable income any part of the proceeds from the sale of oil which were paid over to the assignors. In upholding the assignee’s position, the Court found that as in Palmer v. Bender, supra, the -assignors had retained an economic interest in the assigned leases and that the income from that interest was therefore chargeable to the assignors and subject to depletion. The Court declared (301 U.S. at 659) : The provisions for payment to assignors in oil only, the absence of any obligation of the assignee to pay in oil or in money, and the failure of assignors to take any security by way of lien or otherwise unmistakably show that they intended to withhold from the operation of the grant one-fourth of the oil to be produced and saved up to an amount sufficient when sold to yield $395,000.° [Footnote omitted.] In Anderson v. Helvering, 310 U.S. 404, the Court limited the “economic interest” doctrine developed in Palmer v. Bender and Thomas v. Perkins. There several taxpayers were assigned “certain royalty interests, fee interests, and deferred oil payments in properties in Oklahoma” in return for (310 U.S. at 405-406)— the agreed consideration of one hundred sixty thousand dollars, payable fifty thousand in cash and one hundred ten thousand from one-half of the proceeds received ¡by him which might be derived from oil and gas produced from the properties and from the sale of fee title to any or all of the land conveyed. Interest at the rate of 6% per annum was to be paid from the proceeds of production and of sales upon the unpaid balance. During the first year under the arrangement, the gross proceeds derived from the production and sale of oil and gas from the assigned properties amounted to approximately $55,000,[7] and during the second year, the year in issue in Anderson, the gross proceeds amounted to more than $81,000. One-half of each sum was distributed to the assignor pursuant to the assignment agreement. The assignee-taxpayers then claimed that the amount paid over to the assignor in the year in issue should not be included in their income, relying upon Thomas v. Perhms. The Supreme Court rejected their claim, holding that the transaction should be treated as a sale to the taxpayers, that the sum paid to the assignor was part of the sale price, and that consequently the taxpayers were taxable on the gross proceeds derived from oil production. The Court distinguished Thomas v. Perkins as follows (310 U.S. at 412-413) : The reservation of an interest in tbe fee, in addition to tbe interest in tbe oil production * * * materially affects tbe transaction. Oklahoma Company is not dependent entirely upon tbe production of oil for the deferred payments; they may be derived from sales of the fee title to tbe land conveyed. It is clear tbe payments derived from such sales would not be subject to an allowance for depletion of tbe oil reserves, for no oil would thereby have been severed from tbe ground; an allowance for depletion upon tbe proceeds of such a sale would result, contrary to tbe purpose of Congress, in a double deduction— first, to Oklahoma Company; second, to tbe vendee-owner upon tbe production of oil. Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 321. We are of opinion that tbe reservation of this additional type of security for tbe deferred payments serves to distinguish this case from Thomas v. Perkins. It is similar to the reservation in a lease of oil payment rights together with a personal guarantee by tbe lessee that such payments shall at all events equal tbe specified sum. In either case, it is true, some of the payments received may come directly out of tbe oil produced. But our decision in Thomas v. Perkins does not require that payments reserved to the transferor of oil properties shall for tax purposes be treated distributively, and not as a whole, depending upon the source from which each dollar is derived. An extension of that decision to cover the case at bar would create additional, and in our opinion unnecessary, difficulties to the allocation for income tax .purposes of such, payments and of the allowance for depletion between transferor and transferee. In the interests of a workable rule, Thomas v. Perkins must not be extended beyond the situation in which, as a matter of substance, without regard to formalities of conveyancing, the reserved payments are to be derived solely from the production of oil and gas. The deferred payments reserved by Oklahoma Company, accordingly, must be treated as payments received upon a sale to petitioners, not as income derived from the consumption of its capital investment in the reserves through severance of oil and gas. Petitioners, as purchasers and owners of the properties, are therefore taxable upon the gross proceeds derived from the oil production, notwithstanding the arrangement to pay over such proceeds to Oklahoma Company. See Helvering v. Clifford, 309 U.S. 331; Reinecke v. Smith, 289 U.S. 172, 177; Old Colony Trust Co. v. Commissioner, 279 U.S. 716. Relying on Anderson v. Helvering, petitioner herein contends that as of January 1, 1958, Pan American did not look solely to the extraction of oil or gas for payment of the aggregate amount of $134,619,000, that consequently Pan American did not retain an economic interest in the natural gas in the formations, and that therefore the payments to Pan American during 1958 and 1959 are taxable to it as capital gain realized on the sale of property used in its trade or business. In particular, the petitioner points to the “take-or-pay” provisions in the original contracts, which assured Pan American of minimum annual payments, and to the 1958 Modification Agreements, which permitted Pacific to transfer its interest in the assigned properties and reserved to Pan American one-half of the proceeds from such a sale, and urges that, as of January 1, 1958, gas production from the Pacific formations was not the sole security for the deferred payments and that consequently this case is governed by Anderson v. Helvering. We disagree. Anderson decided that since the transferor of the mineral properties there in question did not look solely to the properties’ subsequent mineral production as the source of the transferees’ payments, the payments should not be eliminated from the transferees’ gross income ;[8] and by inference it may be concluded that such payments were to be treated in the hands of the transferor as the proceeds of sale rather than royalties or the like. But in announcing its decision the Court clearly stated that it was not establishing a rigid rule to be applied in every case regardless of the substance of the transaction under consideration. It declared (310 U.S. at 413) : In tbe interests of a workable rule, Thomas v. PerMns must not be extended beyond tbe situation in wbieb, as at matter of substance, without regard to formalities of conveyancing, tbe reserved payments are to be derived solely from tbe production of oil and gas. [Emphasis supplied.] We think that in substance Pan American looked only to the gas production of the Pacific formations as the source of its deferred payments. In form the “take-or-pay” provisions and the provisions in the Modification Agreements reserving to Pan American one-half of the proceeds from sales by Pacific appear to offer Pan American additional security for the deferred payments. However, closer examination reveals the purported security to be without practical significance. We consider first the “take-or-pay” provisions. In substance they established minimum royalties, and it has been held on a number of occasions that a minimum royalty, when coupled with a royalty based upon the quantity of mineral extracted, is not a sufficiently significant source of return to negate retention of an economic interest. See Wood v. United States, 377 F. 2d 300, 307 (C.A. 5), certiorari denied 389 U.S. 977; Freund v. United States, 367 F. 2d 776, 778 (C.A. 7); cf. Burnet v. Harmel, 287 U.S. 103, 111-112; Nassau Suffolk Lumber & Supply Corp., 53 T.C. 280, 284. Here the “take-or-pay” formulas were geared to potential or possible gas production from the Pacific formations and would thus become effective only if Pacific chose to make payments to Pan American without extracting the gas available to it. In such circumstances, the “take-or-pay” provisions would simply safeguard Pan American’s interest in the gas when Pacific had decided against production. In addition, we think it not without significance that prior to 1958 Pan American treated the payments it received from Pacific as ordinary income — despite the fact that the “take-or-pay” provisions were in the contracts at that time — and that Pan American considered it necessary to introduce new provisions in 1958 in order to justify treating the payments as capital gain.[9] The new provisions, relating to the sale of Pacific’s interest in the assigned properties, were added to the agreement in 1958 specifically for the purpose of enabling Pan American to treat the deferred payments as capital gain. While it is well-established that a taxpayer may reduce his tax burden by means which the law permits, Gregory v. Helvering, 293 U.S. 465, 469, the fact that the 1958 modifications were tax-motivated does invite careful scrutiny of the substance of the arrangement. We conclude that the provisions in the Modification Agreements permitting Pacific to assign its rights under the contracts and granting to Pan American one-half of the resulting proceeds were of no practical consequence, and that in reality, even after the Modification Agreements were executed, Pan American continued to look only to the production of gas as the source of its deferred payments. When the Modification Agreements were executed, Pacific had already received authority from the FPC to construct and operate a pipeline from the four-corners area to the Canadian border, and consequently the formations’ gas reserves were not readily available for sale. Of course, if, upon application, FPC had given its approval, Pacific might have subsequently sold its gas rights, and the purchaser would then have become responsible for the pipeline’s gas supply. But the petitioner has failed to persuade us that, as of January 1, 1958, such a sale was a realistic possibility.[10] The petitioner has contended that the proposed merger with El Paso and the possible sale of Pacific’s contract rights to Pacific Production were two such possible sales. We disagree. The Modification Agreements specifically provided that Pan American was not entitled to a share of the proceeds from an assignment pursuant to a corporate reorganization or merger or from an assignment to a subsidiary of Pacific. Thus, the possibility of these two transactions offered Pan American absolutely no additional security for the deferred payments; even if one of the transactions had actually been consummated, Pan American would not have been entitled to any of the resulting proceeds. The petitioner has also pointed to the possibility (which eventually became a reality) that the then-pending antitrust proceedings would culminate in a court order requiring El Paso to enter into a cash sale of Pacific’s assets. However, the possibility that the merger with El Paso would be approved by the FPC, that the antitrust proceedings would declare the merger unlawful, and that the antitrust decree would require a cash sale of Pacific’s assets, rather than the customary remedy of divestiture not thus restricted, was, as of January 1, 1958, so highly speculative that the possibility of such an extraordinary sequence of events did not offer Pan American significant security for the deferred payments. We therefore conclude that as a practical matter Pan American looked to the gas production of the Pacific formations as the sole source of the deferred payments. We also note several features of this transaction, not emphasized by the parties, which further distinguish Anderson from this case and which give additional support to the conclusion that Pan American retained an economic interest in the Pacific formations. In Anderson, the assignees made a substantial cash downpayment in addition to the subsequent payments based on oil production, interest was required on the unpaid balance, and over 60 percent of the total amount to be paid out of the oil proceeds was paid during the first 2 years after the agreement was signed. Here, apart from Pacific’s initial payment for Pan American’s interest in lease equipment, facilities, and productive wells, Pacific made no downpayment whatever. As a result, Pan American in substance relied exclusively upon gas production from the Pacific formations for its return on the transaction; without such production (or at least the possibility of production [11]), it could not reasonably expect to receive any return at all. Moreover, there was no provision for interest on the unpaid balance of Pacific’s payments. Th'e substantial cash downpayment and the provision for interest in Anderson suggest that the consideration paid there was the purchase price of the assigned properties. The absence of those features here indicates that the amounts paid to Pan American were in the nature of a return on its continuing interest in the Pacific formations and that in reality it looked only to the gas production of those formations for its return. Cf. Bryant v. Commissioner, 399 F. 2d 800, 805-806 (C.A. 5); Nassau Suffolk Lumber & Supply Corp., 63 T.C. 280, 283-284. Similarly, 'the large payments in the first 2 years in Anderson suggest that the assignor’s interest in the oil production of the assigned properties would soon be extinguished and that his position was therefore akin to that of a seller, while the lengthy projected payout period here indicates a far more durable interest, albeit not necessarily a permanent one. Cf. Moberg v. Commissioner, 365 F. 2d 337, 340 (C.A. 5); Bryant v. Commissioner, supra at 805-806; Nassau Suffolk Lumber & Supply Corp., 53 T.C. at 283-284; United States v. Morgan, 321 F. 2d 781, 783-787 (C.A. 5). Together, the absence of a provision for interest and the uncertainty and duration of the probable payout period, make it plain that the total consideration of $134,619,000 was not an ordinary “sale” price. We have found that as of January 1,1958, a reasonable estimate of the time required to produce enough gas to pay the total amount due under the contracts would have been between 50 and 100 years. A projection so far into the future and involving two variables — the annual price of gas and the volume of annual gas production — by its very nature involves a substantial margin of error. But despite the fact that payment of the full $134,619,000 within a period of relatively brief duration would have been far more valuable to it than payment over a substantially longer period, Pan American required no interest on the unpaid balance. The absence of such a requirement, when the time of final payment was so uncertain and so' far off, convinces us that the transaction in issue was not a sale for a fixed purchase price, but an arrangement permitting Pan American to retain an economic interest in the Pacific formations. Furthermore, all of the contracts imposed rather stringent drilling obligations on Pacific and included provisions for reassignment of unprofitable properties to Pan American. Also, in conducting their affairs under the contracts, Pan American and Pacific clarified, modified, or amended the contracts on at least 12 separate occasions. The foregoing is more suggestive of a continuing business relationship and of Pan American’s retention of an economic interest in the properties than it is of a sale. Cf. Edward W. Reid, 50 T.C. 33, 41. Pan American also retained an overriding royalty of 82½ percent of the oil produced and saved from each well on the leased properties in excess of 15 barrels of oil per day per oil well — an interest that would persist in perpetuity even after payment of the aggregate purchase price of $134,619,000. Pan American’s retention of these oil rights alone may or may not suffice to constitute a retained economic interest with respect to the gas in the Pacific formations.[12] But the overriding oil royalty does lend further support to the continuing nature of Pan American’s interest in the properties. We conclude that Pan American retained an economic interest in the gas in the Pacific formations and that the payments it received in 1958 and 1959 should therefore be treated as ordinary income. Decision will be entered imder Rule 50. Contemporaneously with the assignment there was paid $105,000 in cash and $50,000 in notes. The opinion of the Supreme Court did not mention the amount of the proceeds during the first year, but such a finding was made by the Board of Tax Appeals (7 P-H. B.T.A. Memo. 38-492, 38-493) and was included in the opinion of the Court of Appeals (107 F. 2d 459, 460 (C.A. 10)). However, since gross Income thus remained undiminished by reason of these payments, depletion deductions would be allowable to the transferees In respect of the entire gross income. The record is not sufficiently clear to support a finding as to hew Pacific and El Paso have treated the deferred payments for Federal income tax purposes. However, although Pacific and El Paso are not parties to these proceedings, we note that their positions are antagonistic to that of Pan American, and that the position of the Government is in the nature of a stakeholder. A decision that Pan American did retain an economic interest in the assigned gas rights would imply that Pacific and El Paso may exclude from income that portion of the proceeds of gas production attributable to the deferred payments, while a decision that the payments are capital gain to Pan American would imply that the expenses of Pacific and El Paso are capital in nature and that no corresponding exclusion would be allowed to them. In its opinion in Anderson, the Supreme Court Aid not purport to consider the likelihood that the assignee of the properties there in question would subsequently sell them. However, the opinion of the Board of Tax Appeals indicates that the taxpayer — who contended that the transaction not be treated as a sale — had offered no evidence to show that subsequent sales were not of practical importance and that he had therefore failed to sustain his burden of proof: “Sales of fees were involved. The seller retained a lien. How much of the gross receipts was from sales of fees, how much from oil and gas produced from fees, and how much from royalties on leases is not shown. The record does not justify any change in the Commissioner’s determination relating to these items.” 7 P-H. B.T.A. Memo. 38-492, 38-493. Here the petitioner contends that the transaction now in question should be treated as a sale, and the burden of proof is upon it to show that a subsequent sale by Pacific was a realistic possibility as of Jan. 1,1958. The “take-or-pay” provisions offered the possibility of payments even if there were no actual gas production. However, the relevant formulas were geared to potential gas production and were applicable only if Pacific chose not to produce gas available to it. In addition, under the Modification Agreements, Pan American was entitled to one-half of the proceeds of a sale by Pacific of any of its rights under the contracts. However, we have found that the possibility of such a sale was not, as of Jan. 1, 1958, of practical significance. “ The Commissioner has urged that simply by virtue of the rights it retained in the oil in the Pacific formations, Pan American retained an economic interest in all of the assigned properties. In response, petitioner contends that the oil and gas Interests were entirely separate, and it relies primarily in this respect upon Edward J. Hudson, 11 T.C. 1042 (acq. in part and nonacq. in par* 1949-1 C.B. 2, 5), affirmed 183 P. 2d 180 (C.A. 5). That case held that the assignee of a one-half interest in “heavier hydrocarbons,” which were mixed in with unassigned natural gas deposits, had acquired a depletable interest in the "heavier hydrocarbons.” We are by no means persuaded that Hudson controls the question presented here. Petitioner also relies upon Berry Oil Co. v. United States, 25 F. Supp. 97 (Ct. Cl.), certiorari denied 307 U.S. 634, and regs. sec. 1.614-1 (a) (1) and (5)— Example (1), but these authorities relate to assignments of distinct geological layers or areas and are not governing here. However, in view of our disposition of the case, we need not consider this question.