LEISURE DYNAMICS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Leisure Dynamics, Inc. v. Commissioner
Docket No. 4472-69.
United States Tax Court
T.C. Memo 1973-36; 1973 Tax Ct. Memo LEXIS 248; 32 T.C.M. (CCH) 159; T.C.M. (RIA) 73036; February 14, 1973, Filed *248 Lakeside (now Leisure Dynamics) acquired the trademarks, trade names, and other property necessary for making Gumby toys under an agreement with Toy. Toy and its successors retained a security interest in the transferred property. Lakeside was required under the agreement to pay Toy or its successors for an indeterminate time a percentage of its sales of Gumby toys as part of the purchase price. Lakeside acquired the complete, unrestricted, and exclusive right to make Gumby toys under the agreement and subsequent modifications.
Held: Lakeside's agreement with Toy comprised a sale rather than a license, and payments made thereunder were nondeductible capital expenditures. Held, further: Petitioner did not demonstrate that the intangible assets acquired by Lakeside under the agreement with Toy had a useful life which could be estimated with reasonable accuracy. Accordingly, Lakeside was not entitled to deductions for depreciation on these assets. 2 Richard N. Flint and Daniel R. Shulman, for the petitioners. Jay B. Kelly and R. Burns Mossman, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined a deficiency of $148,229.83 in the income *249 tax of petitioner for the taxable year ended December 31, 1965. Included in this determination was respondent's disallowance of a tentative net operating loss deduction from the taxable year ended December 31, 1968. The parties have settled most issues by stipulation, and only the following alternative questions remain for decision: (1) whether the "Gumby" contract and subsequent modifications entered into by Lakeside Industries, Inc., and Gumby Toy Company, Inc., and the assignment of the "Gumbitties" contract entered into by Lakeside Industries, Inc., and Clokey Productions, Inc., constituted contracts for the sale of trademarks and other assets or licensing agreements; or (2) whether, in the event that such contracts effected sales, the assets purchased thereunder are subject to depreciation under section 167. [1]
Petitioner also raised a claim under section 7605(b) which we resolved in favor of respondent at trial. 3 FINDINGS OF FACT The parties entered into a stipulation of facts with exhibits attached. The stipulation and exhibits are incorporated herein by this reference. Petitioner is Leisure *250 Dynamics, Inc., a Delaware corporation, whose principal office at all relevant times was in Minneapolis, Minn. Prior to September 2, 1969, petitioner's name was Lakeside Industries, Inc. (Lakeside). For the taxable years in issue petitioner filed its corporate income tax returns with the district director of internal revenue, St. Paul, Minn.
THE HISTORY OF GUMBY BEFORE LAKESIDE
In the middle 1950's Arthur and Ruth Clokey developed a new kind of cartoon animation called stop motion. In this process a doll is photographed against a three-dimensional background. Animation is achieved by moving the doll a fraction of an inch in each frame of film shot. The star of their cartoons was a doll called Gumby who can only be described as somewhat anthropomorphic and cute. The other prominent character in the films was a horse billed as Gumby's Pal Pokey. With the help of E. Roger Muir (Muir), an executive of National Broadcasting Company, Gumby was placed on network television. On December 7, 1959, Arthur and Ruth Clokey 4 and Muir formed Clokey Productions, Inc., (Productions) with each individual owning one-third of the outstanding stock. In 1966 Arthur and Ruth Clokey bought out the *251 interest of Muir, and in 1967 Productions redeemed all of the stock of Arthur Clokey. Productions re-edited the Gumby films into 5-minute episodes and attempted to syndicate the films with individual television stations across the United States. Although some stations did purchase the Gumby episodes, most stations were unwilling to pay cash for the films but were only willing to give Productions advertising time on television in exchange for use of the films. In the television industry the advertising time received for the use of films is called barter time. Initially the offer of barter time by the television stations was refused by the Clokeys because they had no products to sell; however, in early 1964 they decided to try to use the barter time to sell dolls in the likeness of Gumby. The response to a single commercial run in Los Angeles, in March 1964, was so extraordinary that the Clokeys decided that expert help was needed to produce and promote Gumby. The Clokeys got in touch with Wallace J. Seidler, an advertising agent with great expertise in the toy field, who helped Productions find a manufacturer for the Gumby toy. Productions marketed the toy in the Los Angeles area *252 from 5 March through May 1964; however, it did not have enough capital to permit the Gumby doll to be produced in amounts large enough to meet the demand for them. On June 4, 1964, the Clokeys, Wallace J. Seidler and his wife, and a business associate of Seidler, Edward S. Kellogg, and his wife incorporated the Gumby Toy Company, Inc. (hereafter Toy). The Clokeys, Seidlers, and Kelloggs owned 275, 100, and 125 shares of the outstanding Toy stock, respectively. After Toy's incorporation it distributed the Gumby doll on a royalty free license from Productions. Neither Toy nor Productions actually manufactured or packaged the Gumby toys; these functions were performed by unrelated companies. LAKESIDE'S INTEREST IN GUMBY In the late 1964 Stanley J. Harfenist (Harfenist), who at that time was the national sales manager of a competitor of petitioner (Lakeside), became aware of the phenomenal success of the Gumby toy in Los Angeles. Harfenist sought out Seidler who indicated that the right to manufacture the toy might be for sale. Harfenist was unable to interest his employer in Gumby, and on January 1, 1965, he took a job as national sales manager of Lakeside. Lakeside at this time *253 was seeking a toy which would propel it into national prominence in the toy industry. Harfenist and Seidler were able to convince the management of Lakeside that Gumby was the needed toy based on the success 6 of the promotion in Los Angeles by Productions and Toy. The experience in Los Angeles had shown that the running of the Gumby cartoons was effective advertising for the Gumby doll which created a large demand for the toy in the area where the cartoons could be viewed. IA. Contract Negotiations Lakeside at first decided to acquire the rights to make Gumby toys by purchasing the stock of Toy. By the middle of February 1965, the parties had tentatively agreed that Lakeside would purchase the stock of Toy for $500,000, half to be paid in cash and half in the stock of Lakeside, plus a royalty payable for seven years on all sales of Gumby and Pokey toys in excess of $7,500,000. There was also to be a separate agreement between Lakeside and Productions which would insure that the Gumby cartoons would be shown across the country. The stock purchase agreement was never consummated because it was discovered on February 19, 1965, that the Gumby film character might not be protected *254 by copyrights. Two days later Lakeside learned that Gumby was being "knocked off" - manufactured without payment of a royalty - by a toy company in New York. At this point Lakeside did not wish to invest $500,000 in the rights to make a toy which might become worthless by a proliferation of "knock-offs"; however, Lakeside still felt that Gumby had a great deal of potential. 7 Accordingly, the parties devised another plan for Lakeside to acquire the rights to make Gumby which would not obligate it to expend a great deal of money if the promotion of the toy failed. This plan was embodied in a document entitled PURCHASE AGREEMENT and SECURITY AGREEMENT which was executed by Lakeside and Toy on February 24, 1965, the pertinent parts of which follow: NOW, THEREFORE, in consideration of the covenants and agreements herein contained, the parties hereto agree as follows: 1. The Seller hereby sells, assigns and transfers to Lakeside: (a) the trademarks and trade names "Gumby," "Gumby's Pal, Pokey" and "Gumby the Super Flex" and all of the other trademarks and trade names identifying the characters and other elements appearing in the television cartoon series entitled "The Adventures of *255 Gumby," and the right to manufacture, use and sell products based on such characters and to utilize all of such trademarks trade names on such characters and on other products; (b) all of the tools and equipment owned by Seller and used by it in the manufacture and sale of toy products, which said tools and equipment are described in detail in Exhibit 2 annexed hereto and made a part hereof; (c) all of its right, title and interest in and to the agreements between it an Clokey Productions, contained in Exhibit 1. Lakeside shall not assume nor shall it be liable for any obligations or liabilities between Seller and Clokey Productions, Inc.
2. (a) Simultaneously with the execution of this agreement, Lakeside shall pay to Seller the sum of Fifty Thousand Dollars (50,000.00) and shall, upon compliance with the provisions of Paragraph 14, deliver to Seller twenty thousand (20,000) shares of its authorized common capital stock, which shares shall be fully paid and non-assessable. (b) As additional payment on account of the purchase price, Lakeside shall pay to Seller an amount equal to 6.6% of its net paid sales of units ("net paid sales" and "unit" are herein defined); provided that *256 during the period from February 28, 1965, through March 8 1, 1966, such net paid sales shall be in excess of Seven Hundred Fifty Thousand Dollars ($750,000.00), of any toy products manufactured by Lakeside which are based on the cartoon characters appearing in "The Adventures of Gumby" or which utilized the trademarks and trade names sold to Lakeside herein (said additional payments on account of the purchase price are referred to herein as "deferred payments"). The deferred payments shall continue to be made until this agreement is terminated as hereinafter provided. * * * (e) Lakeside shall render to Seller an accounting of its shipments of all products subject to the provisions of subparagraphs (b) and (c) of this Paragraph 2 not later than the thirtieth day of the month following each calendar quarter of each year for shipments made during the preceding quarter; such accounting shall be accompanied by payment of the deferred payments based on shipments made during such preceding quarter and payment on account of the gross receipts received by Lakeside pursuant to subparagraph (d) hereof. Any adjustments for excess payment on account of deferred payments that were based on shipments *257 and not net paid sales will be made in the next ensuing quarter. Seller shall have the right at reasonable times to inspect or have its duly authorized representative inspect all records of sales and accounting data maintained by Lakeside for the limited purpose of ensuring that Lakeside has complied with the provisions of this paragraph. In order to protect Seller's reversionary rights which may arise in the event of Lakeside's default of this agreement, as herein provided, Lakeside agrees that Seller shall have the right to inspect and receive samples of all products produced by Lakeside or its licensees in order to ensure that the quality of such products is maintained. 3. Seller agrees that it will take all reasonable actions and proceedings and do all things reasonably requested by Lakeside to cause such actions and proceedings to be taken by Clokey Productions, Inc., in order to ensure that the cartoon series entitled "The Adventures of Gumby" is and will continue to be exhibited on television stations throughout the world and will make reasonable efforts to ensure the exhibition of said series on television stations designated by Lakeside. 4. Lakeside shall have the exclusive *258 right to file applications for United States, State and foreign registrations of the trademarks and/or trade names being sold to Lakeside hereunder, it being acknowledged that registrations have at the date hereof not issued on any 9 such trademarks and trade names except for Registration No. 189146 (U.S. Pat. Off.) for the trademark "Gumby." In connection with said trademark "Gumby," Seller agrees to execute a short-form trademark assignment for registration in the United States Patent Office. * * * 9. Seller represents, warrants and agrees as follows: * * * (d) That it will not engage in the manufacture or sale directly or indirectly of any products identical to or similar in either name or appearance to the products made or caused to be made by Lakeside pursuant to this agreement; * * * 11. Seller agrees that it will forthwith change its corporate name so as to delete the name "Gumby" therefrom. In addition to these provisions the agreement contained provisions dealing with minimum required annual sales or minimum payments, licenses, participation in law suits, and conditions on default. In particular Lakeside was required to pay Toy 50 percent of any royalties that it received *259 from the licensing of Gumby to others in addition to the percentage payments based upon Lakeside's own sales. Toy was also given the right to be notified of and participate in any law suit by or against Lakeside on account of infringement of Gumby. In the event that Lakeside initiated an infringement action it was to bear all expenses of the suit and pay Toy 6.6 percent of the net proceeds recovered therefrom. Attached to the agreement as exhibits were documents indicating the source of Toy's title to the "Gumby" and "Gumby's Pal, Pokey" trademarks, a bill of sale for the tangible assets used in making Gumby toys, and a list of all 10 existing agreements between Toy and its subcontractors and sales representatives. Another exhibit acknowledged the existence of an agreement dated May 5, 1964 (the Gumbitties agreement) between Productions and Diener Industries (Diener) which permitted Diener to Manufacture and License a small plastic replica of Gumby called Gumbitty. On February 23, 1965, applications were executed by Productions to assign the registration of the "Gumby" and "Gumby's Pal, Pokey" trademarks to Toy, and on the next day these applications were assigned by Toy to Lakeside. *260 Both the representatives of Lakeside and those of Productions and Toy were aware of the difference in tax consequences between a sale of Toy's assets and a license to use them. The Clokeys were adamant that the Toy assets be sold so they could report their profit as long-term capital gain and would have refused to sign the agreement if they believed it to be a license. Lakeside's attorneys were primarily responsible for drafting the document which, after some revisions, became the final agreement between the parties. Toy's attorney, Harry L. Nelson, Jr., was in on reviewing and revising the drafts of the agreement but was not experienced in tax matters. In the early stages of drafting the Lakeside attorney used a licensing agreement which Lakeside and another party had negotiated as a model for the agreement with Toy; however, in preparing the final draft Lakeside's 11 attorneys included the language in paragraph 1, supra, "The Seller hereby sells, assigns and transfers to Lakeside," as an accomodation to the desires of the Clokeys. Despite the accommodating language the Lakeside attorneys hoped that the final agreement embodied a license although they knew that the sellers held *261 the opposite view. On February 23, 1965, a special meeting was held by the board of directors of the Gumby Toy Company, Inc., at which time a resolution to dissolve was adopted. On March 23, 1965, an agreement was entered into by and between the Clokeys, Edward S. Kellogg, Wallace J. Seidler, and E. Roger Muir which divided up the proceeds from the agreement with Lakeside in the following manner: Ruth Clokey
23.5%
Arthur Clokey
23.5%
Edward S. Kellogg
23.0%
E. Roger Muir
10.0%
Wallace J. Seidler
20.0%
Total
100.0%
Although Muir was not a shareholder of Toy, he was given a share of the proceeds because the right to make Gumby toys had been acquired gratuitously by Toy from Productions in which Muir was a shareholder. On October 11, 1965, Productions assigned to Lakeside the "Gumbitties" contract which it had entered into with Deiner Industries. Under the assignment Lakeside also received title to the Gumbitty trademark and trade name in 12 addition to other trademarks and trade names. The assignment incorporated by reference the pertinent provisions of the Gumby contract with some modifications. In particular, Lakeside was to pay Productions five percent of its net paid sales of any toy which *262 utilized the trademarks or trade names received under the assignment. Lakeside subsequently arranged with Deiner Industries to have the "Gumbitties" contract terminated. During 1966 the parties agreed to two modifications of the February 24, 1965, agreement. On January 19, 1966, an agreement was reached to decrease the payments made on account of the sales of certain toys from 6.6 percent to 3.3 percent of net paid sales. An agreement dated August 10, 1966, required Lakeside to make a payment of 3.3 percent of net paid sales where Lakeside entered into a joint venture with its licensee. This payment was in lieu of the payment of 50 percent of royalties received on all licenses specified in the original agreement. B. Relations between Toy, Productions and Lakeside after Contract From the time the February 24, 1965 agreement was signed until the time of trial a close working relationship existed between Lakeside and Productions. Lakeside's national sales manager, Harfenist, spent a major portion of his time traveling around the country with Productions' 13 representative, Seidler, in order to help Productions syndicate the Gumby cartoons. Lakeside considered the showing of the *263 cartoons on television the key to successfully promoting its line of Gumby toys. The main virtue of the Gumby doll was its ability to be manipulated into various positions. Children enjoyed playing with a Gumby toy because they could make it do the things that they saw Gumby do on television. The Gumby toy had inherent play value; but despite its advantages the toy was difficult to promote on television because it did not do anything by itself and because a commercial showing children playing with a Gumby toy would not have been interesting. Lakeside felt that the best demonstration of the play of a Gumby toy was a Gumby cartoon series. Accordingly, Lakeside only promoted Gumby toys on television in cities where the cartoons were being shown. The television commercials were usually placed on the Children's television show on which the Gumby films were shown with the commercial merely informing the viewer that the characters in the films could be purchased in a local store. Lakeside found that it could market Gumby toys most successfully in areas where the films were being exhibited on the top rated children's show on the top rated station. In cities where the films were not run *264 on such a show but on a lesser rated one, sales of Gumby toys were not as great as 14 in comparably sized cities where they were shown on the best show. Lakeside's usual practice was to precondition a market area by letting the Gumby cartoons run for at least six weeks at the end of which time a strong promotional campaign would be started for Gumby toys on television. If the Gumby films were not being shown in a particular area, the Lakeside management did not feel that advertising Gumby toys on television would generate enough sales to warrant the expense of purchasing advertising time. In a number of instances wholesale toy distributors refused to buy Gumby toys from Lakeside when the cartoons stopped being run in their areas. If Gumby cartoons disappeared entirely from television, Lakeside could not profitably advertise the toys on television; but Lakeside could continue to sell the toys without promotion. In addition to his travels around the United States to help Productions syndicate the cartoons, Harfenist also traveled to foreign countries in order to place the films on television there. When difficulties arose between Productions and its foreign distributor, Harfenist *265 and Lakeside actively worked to help resolve them. Harfenist's trips also permitted him to call on Lakeside's own customers. Harfenist's most effective sales technique was to promise a distributor that the Gumby films would be shown in his locality and that Lakeside would spend 15 an adequate amount of money promoting the toys on television. Lakeside and Productions also cooperated on the production of toys. Lakeside was always interested in increasing the number of toys in its Gumby line. It accepted suggestions from Seidler and borrowed ideas for toys from the cartoons. Lakeside always sent Seidler replicas of new Gumby toys prior to introducing them to the public. Neither Productions nor successors of Toy objected to any proposed use of Gumby by Lakeside except where Lakeside wanted to use the Gumby trademark without making any payment under the Gumby contract. Lakeside was given permission to use Gumby to advertise two non-Gumby toys, American Heroes and Cotton Magic, without any payment for the use of Gumby; but it was denied such permission where it wanted to change the name of its whole line of non-Gumby flexible toys to "Gumby-flex" and when it wanted to change its corporate *266 insignia to an image of Gumby. In order to assure that Gumby cartoons were exhibited in as many markets as possible, Lakeside purchased from Productions all of the barter time which Productions received as compensation from television stations for the use of the films. Lakeside paid Productions 85 percent of the lowest rate that the television station might charge an advertiser for a similar amount of commercial time. The price paid Productions for its barter time was more favorable than Productions might have received from another advertiser. 16 Lakeside used the barter time to advertise both Gumby and non-Gumby toys, but about 20 percent of the barter time was not used. At the time that the Gumby contract was executed, Productions owned 65 five-minute Gumby cartoon episodes. Subsequently, an additional series of 65 episodes was prepared. At the time of trial a number of television stations across the country exhibited Gumby cartoons. On its returns for the years in issue Lakeside treated the amounts paid to the successors of Toy under the Gumby contract and the amounts paid to Productions as a result of its assignment of the Gumbitties contract as deductible royalties. Lakeside's *267 deductions in each year with respect to such contract are the following: 1965
1966
1967
1968 Gumby
$102,676.45
$186,797.21
$119,271.56
$65,878.44
Gumbitties
6,378.87
9,171.87
4,392.75 In addition to the royalties claimed by Lakeside as deductions, Lakeside also received payments from its licensees. Pursuant to the Gumby contract, fifty percent of the payments so received was paid by Lakeside to the successors of the Gumby Toy Company in the following years and amounts: 1965
1966
1967
1968 None
$2,666.66
$28,123.95
$24,283.24
For Federal income tax purposes in each respective year, Lakeside did not report as income the amounts shown above. 17 OPINION On February 24, 1965, Lakeside acquired from Toy the trademarks, other rights, and assets for the manufacture and sale of Gumby toys. Petitioner claims that the Gumby contract effected a license of the right to make Gumby toys and that the payments made thereunder are deductible royalties under section 162. Respondent contends that the Gumby contract embodied a sale of the rights and assets necessary for making the toys and that the payments made thereunder are nondeductible capital expenditures. Countering petitioner's alternative argument, respondent *268 also contends that the assets that Lakeside acquired under the Gumby contract had an indeterminate useful life and could not be depreciated under section 167. We agree with respondent. SALE OR LICENSE We note at the outset that Lakeside's attorneys were primarily responsible for drafting the Gumby contract, that they understood the differences between a sale and a license, and that they appreciated the tax consequences of each type of transaction. Accordingly, we find it difficult to believe that the meaning of the written agreement should fail to conform with Lakeside's view of the transaction.In addition, Lakeside's attorney admitted that the language in paragraph 1 of the Gumby contract, "The Seller hereby sells, assigns and transfers to Lakeside * * *" was inserted in the 18 written agreement to satisfy the desires of sellers who would not have signed the instrument without such language. Petitioner in effect hopes that we can extricate it from a predicament in which Lakeside knowingly placed itself. It is not our role to alter the tax consequences of an agreement which parties freely enter into. Annabelle Candy Co. v. Commissioner, 314 F. 2d 1 (C.A. 9, 1962); Coca-Cola Company v. Commissioner, 369 F. 2d 913 *269 (C.A. 8, 1966). Despite the clear language of sale contained in paragraph 1 of the Gumby contract petitioner claims that two other features of the agreement are inconsistent with a sale and make the writing ambiguous. The first of these is that Lakeside must make percentage of sales payments to Toy or minimum payments for an indeterminate period of time; and the second is that Toy had the right to reclaim the Gumby trademarks and other assets if Lakeside failed to make these payments or defaulted in any other way. Although we have noted that long-term payments without provision for interest are indicative of license royalties rather than capital expenditures, such payments are not necessarily inconsistent with the existence of a sale. See Nassau Suffolk Lumber & Supply Corp., 53 T.C. 280 (1969). In this case Lakeside did not wish to obligate itself to make a large investment in Gumby because of a question as to the copyright of the films and the possibility that the toy could be "knocked off" 19 easily. On the other hand, nothing in the record suggests that Lakeside was unwilling to purchase Gumby if the purchase price was geared to the toy's potential for profit.The payment plan *270 merely solved the trademark and knock-off problem for Lakeside but of itself did not change the character of the transaction from a purchase to a license. In numerous cases a sale has been found to exist despite a long-term payout. Rose Marie Reid, 26 T.C. 622 (1956); Golconda Corporation, 29 T.C. 506 (1957). We are somewhat puzzled by petitioner's second contention. We fail to understand how Toy's right to reclaim the trademarks and other assets on breach is anything more than what it is denominated, a security device. The few conditions and restrictions placed upon Lakeside's use of the Gumby properties are not at all inconsistent with a sale and the retention of a security interest by seller. As long as Lakeside continued to make quarterly payments to Toy and to render an accounting when requested, there was nothing that Toy could do to reclaim the Gumby properties or to interfere significantly with their use by Lakeside. See Gowdey's Estate v. Commissioner, 307 F. 2d 816 (C.A. 4, 1962). Although we believe that the Gumby contract unambiguously effected a sale rather than a license, petitioner has strenuously argued that the agreement when placed in the context of the dealings *271 between Lakeside and the successors to 20 Toy will turn out to be a license. Without question the substance of a transaction rather than its form governs its taxation; however, we have found little authority to support the proposition that a taxpayer may avoid the tax consequences of the form of his own transaction. Annabelle Candy Co. v. Commissioner, supra; Coca-Cola Company v. Commissioner, supra.Reluctant as we may be to look behind an unambiguous, written agreement we shall do so here because the thrust of the trial was upon the dealings of Lakeside and the successors of Toy and because the practical construction which the parties place upon an agreement often illuminates their true intent. Edward W. Reid, 50 T.C. 33, 41 (1968); Pickren v. United States, 378 F. 2d 595, 600 (C.A. 5, 1967). In addition, an analysis of the dealings between the parties will reveal a veneer of a license but a core of a sale. A number of basic tests have been developed for determining whether particular circumstances are indicative of a sale or license. All of them center around the degree of control which the transferor has over the transferee's use of the transferred rights and assets. Moberg v. Commissioner, 310 F. 2d 782 *272 (C.A. 9, 1962); United States v. Wernentin, 354 F. 2d 757 (C.A. 8, 1965). Although the courts have struggled to define the amount of control necessary to turn an apparent sale into a license, retention by the transferor of a substantial right in the transferred property or the 21 continued participation of the transferor in the transferee's business is the touchstone of a license. See Dairy Queen of Oklahoma v. Commissioner, 250 F. 2d 503 (C.A. 10, 1957); Gowdey's Estate v. Commissioner, supra; Schmitt v. Commissioner, 271 F. 2d 301 (C.A. 9, 1959); United States v. Wernentin, supra. Regardless of the precise test to be employed we do not believe that Toy or its successors excercised any significant control over Lakeside's manufacture and sale of Gumby toys. An important fact distinguishing this case from others involving the sale or license of a patent, trademark or franchise is that Gumby had two distinct applications, cartoons and toys. As a result, after the sale both Lakeside and Productions, who owned the cartoon rights, exercised control over Gumby within their respective areas of application. In most instances it was to the advantage of both Lakeside and Productions to work *273 together to promote Gumby and to protect it from infringement. In a number of cases petitioner misrepresents instances where Productions was merely cooperating with Lakeside or protecting its own distinct interests as examples of Production's control over Lakeside's business. Petitioner advances two arguments in order to show that the successors of Toy had control over Lakeside's Gumby toy operations. The first is that because the success of the promotion of Gumby toys was tied to the success of the 22 promotion of the Gumby cartoons the owner of the cartoons retained control over the right to manufacture the toys. We do not think that this is a realistic argument upon the record in this case. Although the demand for Gumby toys was largely created by the showing of the cartoons, Lakeside would have continued to have the right to promote and sell Gumby toys even if Productions refused to exhibit the films. More importantly, as between Lakeside and ProductionsLakeside was clearly the dominant party because both legally and practically Lakeside could control the exhibition of the films. An express provision of the Gumby contract required Productions to "make reasonable efforts to *274 ensure the exhibition of said [The Adventures of Gumby] series on television stations designated by Lakeside"; and additionally, Productions could profit from the cartoons only if Lakeside were willing to purchase the barter time it received as payment from television stations. The record is replete with instances in which Productions willingly accepted Lakeside's help in syndicating the cartoons with no evidence that Productions ever refused to be aided. Petitioner places undue reliance upon Schmitt v. Commissioner, supra, which does in one respect superficially resemble this case. Schmitt developed a mechanical accounting system which he franchised others to use and sell. Schmitt's agreements with franchisees contained a number of 23 conditions and restrictions not present here which led both this Court and the Ninth Circuit to conclude that the agreements were licenses because Schmitt retained considerable control over his franchisees' business. Among the many factors relied upon by both courts in reaching this conclusion was the fact that Schmitt retained title to an electrical device which was crucial to the operation of the accounting system. Petitioner claims that Productions' *275 ownership of the cartoons was similar to Schmitt's ownership of the electrical device; however, we do not believe that petitioner's analogy is appropriate. First, as we have noted, Lakeside did have practical control over the exhibition of the cartoons. Second, although the cartoons were a crucial factor in the Gumby toy's success, they were not crucial in the same way that Schmitt's electrical device was crucial in his accounting system. Schmitt's franchisees could do nothing with the accounting system without his device. In this case Productions' ownership of the cartoons could not be used to make the right to make the toy useless, but the ownership could only be used to make the toy less profitable in the unlikely event that Productions desired to cut off its only purchaser of barter time. In actuality, Lakeside's toy business was not dependent upon the Gumby cartoons themselves but upon their acceptance by television stations and the public. Neither 24 Lakeside nor Productions could really control this acceptance, but Lakeside did have reasonable control over the means of obtaining public acceptance for the cartoons through its agreement with Toy and relationship with Productions. *276 Petitioner's second argument for contending that Productions maintained control over Lakeside's use of Gumby is based upon purported provisions in the Gumby contract which give the successors of Toy the right to approve Lakeside's use of Gumby in particular toys. Paragraph 2(e) of the Gumby contract does contain the following language: In order to protect Seller's reversionary rights which may arise in the event of Lakeside's default of this agreement, as herein provided, Lakeside agrees that Seller shall have the right to inspect and receive samples of all products produced by Lakeside or its licensees in order to ensure that the quality of such products is maintained. This language, like the rest of the Gumby contract, was drafted primarily by Lakeside's attorneys, and we are disposed to take it at face value. Not only did Toy have reversionary rights in Gumby as a toy, but also Productions had a continuing proprietary interest in Gumby as a cartoon. The provision quoted above does not appear to be anything more than minimal protection for these interests. We fail to see how Toy's right to inspect and receive samples could amount to the power to exert significant control over *277 Lakeside's business. 25 Petitioner has exhorted us strongly to place the written agreement into the context of the negotiations; however, the exhortations have overlooked certain aspects of the negotiations which we consider to be highly detrimental to petitioner's argument. In particular, petitioner does not take into account the fact that Lakeside rather than Toy had the superior expertise in developing and marketing toys. In fact, from the point of view of the creators of Gumby the whole purpose of the agreement was to place the Gumby toy in hands more competent than their own. Therefore, it is unlikely that Toy could have ever intended to play a significant role in the development of Gumby toys by Lakeside. Petitioner claims that the true intent of the inspection provision in paragraph 2(e) of the Gumby contract is best demonstrated by the action of the parties following the execution of the agreement. If such is the case, then it is absolutely clear that Toy and its successors exercised no control at all. Lakeside and the successors of Toy exchanged suggestions and borrowed ideas from each other. Lakeside also sent samples of new toys to Seidler. None of these activities *278 amounted to anything more than manifestations of a good relationship between parties whose mutual interests were served by such cooperation. Petitioner was given extraordinary latitude in presenting evidence which might tend to show that the successors of 26 Toy exercised control over the use of Gumby by Lakeside. In all of the voluminous correspondence introduced by petitioner there is not a single instance where the successors of Toy objected to any use of Gumby by Lakeside as long as Lakeside was willing to make payments for the use under the contract. Petitioner points out two instances where the use of Gumby was denied by the successors of Toy; but in these two instances Lakeside wanted to use the Gumby name for free to advertise non-Gumby toys. In essence, the Toy people were merely trying to hold Lakeside to its contract and not attempting to control Lakeside's use of Gumby. Quite to the contrary of petitioner's assertions, there are a number of instances in the relationship between the parties which indicate that Lakeside was able to force its wishes on the Toy people. In particular, Lakeside did manage to obtain two releases from the contract to use the Gumby name without *279 compensation to advertise non-Gumby products, and Lakeside was able to have its toys displayed in new cartoons made by Productions. We need not decide whether these events were merely instances of mutual cooperation or examples of coercion by Lakeside, but they do indicate that Lakeside could have its way with the successors to Toy. In view of the entire record we believe that Lakeside acquired under the Gumby contract the complete, unrestricted and exclusive right to make Gumby toys. The only rights 27 retained by the seller were the security interest reversionary rights which would only arise if Lakeside defaulted in its obligations. Neither under the letter nor operation of the contract were the successors to Toy able to exert significant control over Lakeside's use of Gumby. Accordingly, we hold that the Gumby contract effected a sale and that the payments made thereunder by Lakeside were capital expenditures and not deductible. On October 11, 1965, Productions assigned to Lakeside the Gumbitty trademark and trade name and the "Gumbitties" contract which it had entered into with Deiner Industries. The assignment incorporated by reference the terms of the Gumby contract except *280 that Lakeside's percentage payment for toys using the Gumbitty trademark or trade name was 5 rather than 6.6 percent of net paid sales of such toys. The parties have not argued that amounts paid to Productions under this assignment should be treated differently from those paid under the original contract. The assignment instrument itself as well as the dealings of the parties clearly indicate that the payments made thereunder were of the same nature as those made under the Gumby contract. For the reasons which we have elaborated with respect to the Gumby contract we hold that the payments made under the assignment are nondeductible capital expenditures for purchase of the Gumbitty trademark and trade name. 28 DEDUCTIONS FOR DEPRECIATION Because we have found the Gumby contract and the Gumbitty assignment to comprise sales rather than licenses, we now turn to petitioner's alternative argument that deductions for depreciation should be allowed for the intangible property purchased under the contracts. In addition to molds and dies for making toys (which are concededly depreciable) and inventory, Lakeside purchased a number of trademarks, trade names, and other rights under the Gumby *281 contract and the assignment. All of these rights were intangible property, and for convenience they might be denominated collectively as the right to make Gumby toys. Petitioner claims that based upon Lakeside's experience in the Toy business and the peculiar relationship of the Gumby toys to the Gumby cartoons the right to make Gumby toys had a useful life which could be measured with reasonable certainty of five years. Assuming that petitioner's claim is true, section 1.167(a)-3, Income Tax Regs., does appear to allow depreciation deductions in such a case. Respondent contends that trademarks, trade names, and similar intangible rights have indeterminate useful lives, that all prior cases have refused to permit such rights to be depreciated, and that petitioner has failed to show that the useful life of the right to make Gumby toys could be estimated with reasonable certainty. We agree with respondent's last contention. 29 Petitioner presented a great deal of evidence designed to educate the Court about the toy business. Unfortunately, we believe that this evidence tends to show that the useful life of the right to make Gumby toys cannot be measured with reasonable accuracy. *282 Petitioner's witnesses testified that on the average a "good promotional toy" could be manufactured and sold profitably for three years at the end of which time it would disappear from the market. A promotional toy is one which a manufacturer tries to sell in large quantities through an extensive advertising campaign. According to these witnesses the useful life might increase to five years if the promotion of such a toy is done on a region by region rather than national basis. One of petitioner's witnesses testified that of the tens of thousands of toys which had been introduced in his memory only about a dozen had remained on the market for ten years or more. In Lakeside's own experience the average toy remained in its line for about two-and-a-half years. Although the figures presented by petitioner tend to show that on the average a toy can be manufactured and marketed for a period of three to five years, the analysis does not shed much light on the useful life of Gumby.Basically, the Court is puzzled to determine what constitutes an average toy. Apparently, a toy is any object sold to amuse an adult or child that is not a game (whatever that is); 30 and the classification *283 of toys contains items more dissimilar to each other than might be found under such broad headings as machines or buildings. In addition, the factors leading to the obsolescence of the right to make a toy are less easily measured than those which cause the obsolescence of tangible property. The right to make a toy does not wear out, the public's acceptance of the toy wears out. Therefore, the life of the right to make a toy is dependent upon such variables as the relationship of the toy to a person or character, the inherent attractiveness of the toy, the manner in which the toy is promoted, the success of competing toys, and changes in public taste. To say as petitioner does that all toys die, a rule to which there are some exceptions, does not explain how or when Gumby will die. We agree with petitioner that the useful life of the right to make Gumby is to be measured by the length of time which Lakeside might reasonably be expected to have manufactured and marketed the toy. Massey Motors v. United States, 364 U.S. 92 (1960). We cannot agree that petitioner has provided us with an adequate basis for measuring that length of time. Although it might be true that both the Gumby *284 films and the Gumby toys will disappear from view simultaneously, it does not follow, as petitioner contends, that the useful lives of the films and of the right to make the toys are identical. Petitioner has not demonstrated 31 that the right to make Gumby toys is in any way dependent upon the films themselves, which Productions depreciated using a five-year useful life, but it has at best shown that the life of the right to make the toys is coterminous with the life of the right to make and show the films. Petitioner presented us with no evidence to show that Productions' right to make and show the cartoons had a limited life. At the time of trial, over six years after the Gumby contract was executed, the cartoons were still being shown in some places and the toys were still on the market. Admittedly, neither application of Gumby was a profitable as it had once been; but there is nothing in the record to suggest that both Gumbies would not be minimally profitable for an indeterminate time. Petitioner has failed to prove that the useful life of the right to make Gumby could be estimated with reasonable certainty. Accordingly, we hold that Lakeside was not entitled to deductions *285 under section 167 for depreciation of the intangible property acquired from Toy and Productions. ROYALTY PAYMENTS The remaining question to be decided is whether the 50 percent of royalties paid by licensees to Lakeside that Lakeside paid to the successors of Toy is includible in Lakeside's gross income for 1968. Paragraph 2(d) of the Gumby contract provided that in addition to the percentage 32 compensation Lakeside was to pay based upon its own net paid sales Lakeside was to pay Toy 50 percent of any royalties that it received from licensing the right to make Gumby toys to others. In 1968 Lakeside paid the successors of Toy $24,283.24 under this provision. Petitioner claims that Lakeside could not be chargeable with the portion of the royalties paid to Toy's successors because at no time did it have any right to keep such royalties and because it did not earn the royalties. We believe that this claim ignores both the written contract and the intent of the parties. As we have noted previously, the Gumby contract embodied a sale of the right to make Gumby toys to Lakeside; however, the parties desired that the sale price be geared to the profits from all uses of the right. If *286 the purchase contract had contained only a percentage of sales payment provision and no royalty sharing provision, Lakeside would have been able to develop a profitable use of the right to make the toy without making payment therefor. It seems clear to us that the 50 percent of royalties paid by Lakeside to the successors of Toy was part of the purchase price for the right to make Gumby. Lakeside had sole discretion under the agreement and its modification in determining whether the right to make Gumby should be licensed. Certainly, the successors of Toy could not be held to have 33 earned income which they had no power to create. Accordingly, we hold that the $24,283.24 paid by Lakeside to the successors of Toy represented income earned by it which must be included in its gross income for 1968. Additionally, we hold that Lakeside may not deduct such payment as it represents a capital expenditure for the purchase of the right to make Gumby. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩